UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
ROCK ISLAND DIVISION

| | | |
|---|---|---|
| ALEXANDER MARUYAMA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:22-cv-04124-SLD-RLH |
| | ) | |
| JUSTIN LANDI, | ) | |
| | ) | |
| Defendant. | ) | |

ORDER

Before the Court are Plaintiff Alexander Maruyama's Motion for Summary Judgment,

ECF No. 51, and Defendant Justin Landi's Motion for Summary Judgment, ECF No. 50. For the

following reasons, Plaintiff's motion is DENIED, and Defendant's motion is GRANTED.

**BACKGROUND[1]**

Plaintiff entrusted Defendant to run his cryptocurrency mining equipment. This case

arises out of the breakdown of Plaintiff and Defendant's business relationship and Plaintiff's

allegations that Defendant committed wrongdoing both during and after their relationship came

to an end. Neither party explains what cryptocurrency mining is, and the Court finds that a short

explanation is warranted to provide context to the parties' arguments. Cryptocurrency is "[a]

digital or virtual currency that is not issued by any central authority" and that is "designed to

function as a medium of exchange." Cryptocurrency, Black's Law Dictionary (12th ed. 2024).

---

[1] At summary judgment, a court must "constru[e] the record in the light most favorable to the nonmovant." *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Unless otherwise indicated, this background has been drawn from Plaintiff's statement of undisputed material facts, Pl.'s Mot. Summ. J. 3–8; Defendant's response thereto, Def.'s Resp. 2–8, ECF No. 53; Defendant's statement of undisputed material facts, Br. Supp. Def.'s Mot. Summ. J. 2–9, ECF No. 50-1; Plaintiff's response to Defendant's statement of facts and Plaintiff's statement of additional facts, Pl.'s Resp. 3–19, ECF No. 52; Defendant's reply to Plaintiff's additional facts, Def.'s Reply 2–3, ECF No. 55; and exhibits to the filings.

Cryptocurrency mining "is how some cryptocurrencies . . . process transactions and mint new [digital] tokens." Allie Grace Garnett, *What is crypto mining and how does it work?*, Britannica Money, https://www.britannica.com/money/what-is-crypto-mining (last visited Sept. 29, 2025). A blockchain is the data structure through which cryptocurrency transactions are identified, tracked, and shared across networks of computers, working as a digital ledger. *Id.* For a blockchain to track cryptocurrency transactions, the transactions must be verified by independent blockchain participators. *Id.* Blockchain verifiers, also known as cryptocurrency miners, are given the chance to verify cryptocurrency transactions by solving complicated mathematical problems. *Id.* The first miner to solve the problem and then verify the transaction on the blockchain is rewarded with a small amount of cryptocurrency. *Id.* Miners rely on advanced and specialized computer hardware to successfully mine cryptocurrency before others can secure the cryptocurrency reward for themselves. *Id.* Because cryptocurrency mining is technologically complex and requires advanced equipment, one of a miner's biggest expenses is electricity, and miners work to reduce their power bills by locating their operations in areas with inexpensive and reliable access to high amounts of electricity, *see id.*, which is part of why this case is in the Central District of Illinois, *cf.* Landi Dep. 28:13–23, Pl.'s Mot. Summ. J. Ex. A, ECF No. 51-1 (testifying that Plaintiff sent mining equipment to East Moline, Illinois because electricity was cheaper in East Moline than in Japan where Plaintiff lives).

Plaintiff is a citizen of Japan and Defendant is an Illinois resident—the two met in Japan in 2017 while Defendant was traveling with friends. Plaintiff and Defendant discussed their mutual interest in cryptocurrency, and Defendant built a mining rig in Plaintiff's apartment to demonstrate what the process looked like. Later in 2017, Plaintiff and Defendant entered into an agreement pursuant to which Defendant built and managed Plaintiff's cryptocurrency mining

equipment in a warehouse in East Moline, Illinois.  Defendant owns and controls Quad Cities

Ethereum Mining ("QCEM").  His previous business partner, Mark Redeker, owns Twin Titans,

LLC ("Twin Titans").  Both QCEM and Twin Titans owned and/or controlled Coingen, LLC

("Coingen"), the entity that owned the warehouse where Plaintiff's equipment was stored.  In

2021, Plaintiff and Defendant modified their agreement to include that Defendant would receive

at least ten percent of the monthly profits earned by Plaintiff's equipment.  Defendant had access

to Plaintiff's "payout sites" for different types of cryptocurrencies, like Ethereum ("ETH"),

Ethereum Classic ("ETC"), and Litecoin ("LTC").  Pl.'s Mot. Summ. J. 4; Def.'s Resp. 3, ECF

No. 53.

In his role, Defendant generally oversaw the function of the miners while Plaintiff could

see whether his miners were "online" or not through various websites.  The parties operated

under this agreement until March 2022.  At that time, Plaintiff terminated the business

relationship.  He filed this lawsuit six months later, bringing four claims against Defendant for

conversion, fraud, breach of fiduciary duty, and breach of an oral agreement.  *See generally*

Compl., ECF No. 1.  The parties both move for summary judgment on all claims.  Pl.'s Mot.

Summ. J. 3; Def.'s Mot. Summ. J. 1–2.[2]  The briefing on both motions is complete.  *See*

*generally* Br. Supp. Def.'s Mot. Summ. J., ECF No. 50-1; Def.'s Resp.; Pl.'s Resp., ECF No. 52;

Def.'s Reply, ECF No. 55; Pl.'s Reply, ECF No. 54.

## DISCUSSION

### I.    Legal Standard

Summary judgment should be granted "if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

---

[2] Defendant's summary judgment motion, brief in support of summary judgment motion, and reply are all
unpaginated; therefore, the Court uses the page numbers generated by CM/ECF when referring to these documents.

R. Civ. P. 56(a). At the summary judgment stage, the court's function is not to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial—that is, whether there is sufficient evidence favoring the non-moving party for a factfinder to return a verdict in its favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *McCann v. Iroquois Mem'l Hosp.*, 622 F.3d 745, 752 (7th Cir. 2010) (citing *Anderson*, 477 U.S. at 255). "A genuine issue for trial exists only when a reasonable jury could find for the party opposing the motion based on the record as a whole." *Pipitone v. United States*, 180 F.3d 859, 861 (7th Cir. 1999) (quotation marks omitted). "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment . . . ." *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017). The court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quotation marks omitted).

"One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The party moving for summary judgment has an initial burden "to inform the district court why a trial is not necessary," but how the party may discharge that burden depends on whether the party has the ultimate burden of proof on a claim. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). When the movant bears the ultimate burden of proof on a claim, it "must lay out the elements of the claim, cite the facts which it believes satisfies the[] elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant on the claim." *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*,

4

778 F.3d 593, 601 (7th Cir. 2015).  When the movant does not bear the ultimate burden of proof

on a claim, it can satisfy its initial burden by pointing to an absence of evidence to support the

non-movant's case.  *Modrowski*, 712 F.3d at 1168.  If the movant has discharged its burden, the

non-movant must "respond . . . by identifying specific, admissible evidence showing that there is

a genuine dispute of material fact for trial."  *Grant v. Trs. of Ind. Univ.*, 870 F.3d 562, 568 (7th

Cir. 2017).  The non-movant cannot refer to its own pleadings, *Celotex*, 477 U.S. at 324, but

must instead "cit[e] to particular parts of materials in the record, including depositions,

documents, [and] . . . affidavits or declarations" or "show[ ] that the materials cited do not

establish the absence or presence of a genuine dispute," Fed. R. Civ. P. 56(c)(1).

The movant is "entitled to a judgment as a matter of law" when the non-movant has

failed to put forth sufficient evidence to satisfy the essential elements of its case as to which it

has the burden of proof.  *Celotex*, 477 U.S. at 323 (quotation marks omitted).  In other words, if

the non-movant fails to make a showing of fact sufficient to establish an essential element of its

case, summary judgment will be granted against it.  *Id.* at 322–23.

## II.    Analysis

The crux of the dispute between the parties is whether Plaintiff has enough evidence to

support his claims.  Plaintiff argues that he has enough evidence to show that he is entitled to

judgment as a matter of law, or in other words, that he has enough evidence to support his claims

that a reasonable jury *could only* find in his favor.  Plaintiff further argues that Defendant bears

the fault for any missing evidence because Defendant had the duty to create and maintain

accurate records.  Defendant, by contrast, argues that Plaintiff does not have enough evidence to

create a genuine dispute of material fact on all elements of his claims, or in other words, that

Plaintiff does not have enough evidence from which a reasonable jury *could even* find in his favor.

The Court will first address Plaintiff's argument that any evidentiary failings are Defendant's fault. The Court will then address each claim and consider whether each party is entitled to summary judgment as to that claim. The Court considers all the evidence, including evidence attached to both parties' filings, when considering whether there are genuine disputes of material fact for trial. *See Torry v. City of Chicago*, 932 F.3d 579, 584 (7th Cir. 2019) ("The court was . . . free to consider evidence submitted in response to one motion when it decided the other."); *Davis v. TimeWarner Cable of Se. Wis., L.P.*, 651 F.3d 664, 671 (7th Cir. 2011) (stating that summary judgment is appropriate when the evidence "as a whole" shows there is no genuine dispute as to any material fact).

### A. Defendant's Failure to Keep Records

In response to Defendant's argument that Plaintiff has failed to produce admissible evidence to support his claims, *see, e.g.*, Br. Supp. Def.'s Mot. Summ. J. 10, Plaintiff argues that his "inability to produce receipts and invoices stems from [Defendant's] failure to provide them . . . in direct violation of his fiduciary duty to provide accountings to" Plaintiff. Pl.'s Resp. 21; Pl.'s Reply 1–3 ("[Landi] contend[s] Maruyama has failed to produce admissible evidence to support his claims . . . . Worth reiterating, however, is the fact Landi owed a fiduciary duty to Maruyama to account to Maruyama for all their business dealings, which Landi failed to do."). In support, he cites *R.J. Management Co. v. SRLB Development Corp.*, 806 N.E.2d 1074, 1082 (Ill. App. Ct. 2004). But he fails to actually develop any argument that such a violation would excuse his failure to provide evidence.

Perhaps he meant to imply that the violation of such an alleged duty would create a presumption that any invoices or records that should have been created would be helpful to his claims—after all, the court in *R.J. Management Co.* was addressing the question of whether there was a fiduciary duty between the parties in the context of determining what amount of evidence the defendant would need to identify to overcome the presumption that evidence it destroyed would have been prejudicial to its case. *Id.* at 1081–82. The Court doubts such a principle would apply in this case because there is no allegation that Defendant *destroyed* records. Instead, Plaintiff is claiming they were never made. And *R.J. Management Co.* is an Illinois case applying Illinois evidence law, *id.* at 1081, whereas, of course, this is a federal case. The Court will not make Plaintiff's arguments for him, so it does not consider this undeveloped argument any further. *See United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991) ("[P]erfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived.").

Throughout his summary judgment filings, Plaintiff also mentions that Defendant "has no records" to contradict Plaintiff's statements. *See, e.g.*, Pl.'s Mot. Summ. J. 4. But this gets the burdens at summary judgment backwards. Plaintiff has the ultimate burden to prove his claims. For the Court to grant Plaintiff summary judgment, Plaintiff needs to not only identify evidence from which a jury could find in his favor on his claims but also show that there can be no dispute as to such evidence and a jury could not reasonably find in Defendant's favor. Whether Defendant has evidence to dispute Plaintiff's claims will become relevant to resolution of Plaintiff's summary judgment motion only if Plaintiff first provides his own evidence— Defendant need not provide evidence to rebut a factual proposition if Plaintiff fails to properly support it in the first place. *Johnson v. Hix Wrecker Serv., Inc.*, 651 F.3d 658, 662 (7th Cir.

2011) ("A party opposing summary judgment does not have to rebut factual propositions on which the movant bears the burden of proof and that the movant has not properly supported in the first instance.").  Defendant need not provide his own evidence for the Court to grant him summary judgment either.  *Modrowski*, 712 F.3d at 1168 (noting that a party moving for summary judgment on an issue for which it does not bear the ultimate burden of proof does not need to "support its motion with affidavits or similar materials *negating* the opponent's claim" (quotation marks omitted)).  For the Court to grant Defendant summary judgment, Defendant need only show that there is an absence of evidence to support Plaintiff's claims.  If Defendant does so, Plaintiff will need to come forward with evidence from which a jury could find in his favor on all elements of his claims.

### B.  Conversion

Plaintiff's first claim is that Defendant wrongfully converted the following from him: cases used to house graphics processing units ("GPUs"), Antminer S9 Bitcoin Miners ("S9s"),[3] a 500,000-Bytecoin bonus, and LTC, ETH, and ETC.  Compl. 3–5.  "Conversion is the unauthorized deprivation of property from the person entitled to its possession."  *In re Estate of Yanni*, 48 N.E.3d 1161, 1166 (Ill. App. Ct. 2015) (quotation marks omitted).  The elements of conversion are: "(1) the unauthorized and wrongful assumption of control, dominion, or ownership by the defendant over the personal property of another; (2) the plaintiff's right in the

---

[3] Once again, neither party attempts to inform the Court of what these pieces of equipment are or their purpose in cryptocurrency mining.  A cryptocurrency miner or mining rig is a specialized computer system designed to perform mining tasks on the blockchain network.  *See* Andrew Kamsky, *What Is A Crypto Mining Rig & How To Build It?*, CCN (July 30, 2024, at 9:05 AM), https://www.ccn.com/education/crypto/how-to-build-mining-rig/.  An Antminer S9 is a particular brand and type of miner.  *See* AntMiner S9 ~ 13.5TH/s @ 0.098W/GH 16nm ASIC Bitcoin Miner with Power Supply and Cord, Amazon, https://www.amazon.com/AntMiner-S9-13-5TH-0-098W-Bitcoin/dp/B01GFEOV0O (last visited Sept. 29, 2025).  The computer system relies on GPUs to solve the complex equations necessary to "mine" the currencies.  *See* Kamsky, *supra*.  A miner can be optimized with multiple high-performance GPUs to ensure maximum hash rate (*i.e.*, the speed at which data can be processed through the machine) and mining efficiency.  *See id.*

property; (3) the plaintiff's absolute and unconditional right to immediate possession of the

property; and (4) a demand for possession of the property." *Id.*

### a. GPU Cases

Plaintiff's first conversion theory involves GPU cases. *See* Compl. 3–4. The claim is

difficult to analyze because the bounds of the claim are not clear—is Plaintiff claiming that

Defendant took money meant for GPU cases and used it for something else or is Plaintiff

claiming that Defendant bought GPU cases but then converted them? Plaintiff asserts in his

summary judgment motion that he "entrusted [Defendant] to purchase $39,750 worth of GPU

cases for" him, Pl.'s Mot. Summ. J. 5, but that he "did not receive all the GPU cases" that he

paid for, *id.* (citing Landi Dep. 144:19–21). As a remedy, Plaintiff requests "$4,800 for the

*nonexistent* GPU cases," *id.* at 16 (emphasis added), which suggests that he thinks Defendant

spent $34,950 on GPU cases and converted the rest of the *money* by using it for a different

purpose (*i.e.*, those GPU cases are nonexistent because they were never purchased). But the

evidence Plaintiff cites to support his contention that he did not receive all the GPU cases he paid

for is Defendant's deposition testimony that "Redeker was the one who ordered these cases and

the one's missing" and that Redeker was "currently using [them] for himself." Landi Dep.

144:19–21. This suggests that the GPU cases exist but were taken by someone else.

Regardless of how the Court should construe the claim, Plaintiff has not pointed to

sufficient evidence in the record from which a jury could even find in his favor on this

conversion claim. Defendant does not dispute that Plaintiff entrusted $39,750 to him for the

purpose of purchasing GPU cases. *See* Def.'s Resp. 4. But Plaintiff has failed to point to any

evidence that GPU cases or money that he had a right to were converted by Defendant. If the

claim is that Defendant exercised control or dominion over GPU cases that had been ordered, the

only evidence in the record suggests someone other than Defendant exercised unauthorized control and dominion over Plaintiff's GPU cases.  If the claim is that Defendant failed to put all the money toward GPU cases, Plaintiff first attempts to create a dispute of fact by arguing that Defendant "testified he did not purchase the correct amount of GPU cases."  Pl.'s Resp. 5 (citing Landi Dep. 138:23–139:7).  But this is a misstatement of the evidence.  In his deposition, Defendant testified that he purchased more GPU cases than Plaintiff had alleged were ordered in the complaint, not that he purchased a different amount of GPU cases than he had been asked to. *See* Landi Dep. 138:3–22.[4]

Next, Plaintiff states that he and Defendant "exchanged messages regarding a total of fifty six . . . GPU cases" and that he "received fewer than fifty six . . . cases."  Pl.'s Resp. 5 (citing Landi Dep. 140:15–142:8; Maruyama.000056, Def.'s Mot. Summ. J. Ex. C, ECF No. 50-4 at 3; Compl. ¶¶ 16–17).  But the portion of Defendant's deposition Plaintiff cites to support this statement is Plaintiff's attorney describing an exhibit to Defendant and Defendant agreeing that the description is accurate.  Landi Dep. 140:15–142:8.  The second piece of evidence Plaintiff cites is the exhibit referenced.  It is a document that Plaintiff produced in discovery that has some screenshots of messages from Defendant apparently to Plaintiff (the recipient is not identified) as well as two tables labeled "Missing ETH rigs" and "Total Amount owing from Justin."  *See* Maruyama.000056.  The final piece of evidence cited is simply the allegations of the complaint which "are not evidence," *Nisenbaum v. Milwaukee County*, 333 F.3d 804, 810 (7th Cir. 2003); *Burrell v. City of Mattoon*, 378 F.3d 642, 648 (7th Cir. 2004) ("[M]ere allegations in the

---

[4] Defendant said he was basing his testimony on an invoice, Landi Dep. 138:23–139:5, which Plaintiff represents was not produced in discovery, Pl.'s Resp. 5.  If Plaintiff was intending to make some sort of evidentiary presumption argument based on this alleged failure, it is undeveloped.

pleadings, unsupported by record evidence, cannot create an issue of fact defeating summary judgment.").

Even if the Court considers the messages as support for the proposition that Defendant was supposed to purchase fifty-six cases, the only evidence that would support Plaintiff's contention that he received fewer than fifty-six cases is one of the tables. (Defendant testified that he purchased sixty GPU cases. Landi Dep. 140:3–5.) One of the tables lists two types of GPU cases and lists an "[o]rdered [q]uantity" and an "[a]ctual [q]uantity" for each. *See* Maruyama.000056. This table indicates an "[o]rdered [q]uantity" of fifty-six and an "[a]ctual [q]uantity" of forty-nine. *Id.* But this table is totally unexplained by Plaintiff. It was apparently prepared by Plaintiff himself. *See* Pl.'s Mot. Summ. J. 9 (stating that Plaintiff produced "his own personal records"). It is not dated and there is no explanation of what information the table is based on. There is not even an explanation of what "[a]ctual [q]uantity" or "[o]rdered [q]uantity" mean. Is actual quantity the number of cases actually present at the warehouse, the number of cases Plaintiff was receiving profit from, or the actual quantity that Defendant ordered for Plaintiff? Is ordered quantity the number of cases that Plaintiff asked Defendant to order or the number of cases that Defendant ordered for Plaintiff?

More importantly, Plaintiff makes no cogent argument as to how this table would be admissible at trial. *See*, *e.g.*, Br. Supp. Def.'s Mot. Summ. J. 10 (arguing that Plaintiff's "demonstrative exhibits and self-prepared spreadsheets" are inadmissible); *see Cairel v. Alderden*, 821 F.3d 823, 830 (7th Cir. 2016) ("To be considered on summary judgment, evidence must be admissible at trial, though the form produced at summary judgment need not be admissible." (quotation marks omitted)). The table contains Plaintiff's own out-of-court statements that are being offered for their truth, so they are hearsay. Plaintiff argues that his

11

"spreadsheets . . . have been authenticated via depositions," Pl.'s Resp. 21, without any citation

to the record or to the rules for authentication.  But even if there is evidence that the table is what

it purports to be—a table created by Plaintiff—that says nothing about whether it would be

admissible at trial.  "Authentication, in-and-of-itself, does not assure admissibility, rather,

authentication is merely a condition precedent to admissibility."  *Nemecek v. Karamacoski*, No.

2:03 CV 346, 2005 WL 1185282, at *3 (N.D. Ind. May 19, 2005); *Article II Gun Shop, Inc. v.

Gonzales*, 441 F.3d 492, 496 (7th Cir. 2006) ("[A] document is not admissible simply because it

has been authenticated.").  The Court will not make Plaintiff's admissibility arguments for him.

Without any admissible evidence showing that Defendant took from Plaintiff either

money intended for GPU cases or GPU cases, Plaintiff cannot create a triable issue on this part

of the conversion claim.  Defendant's motion is granted as it relates to conversion of GPU cases,

and Plaintiff's motion is denied.

### b.  S9 Miners

The next type of property at issue in Plaintiff's conversion claim is twenty-six S9s.

Compl. 3.  Plaintiff states that he "ordered and paid for" 136 Antminer S9s, Pl.'s Mot. Summ. J.

4, and that at some point he "noticed [that] twenty six . . . of his S9s were no longer operating,"

*id.* (citing Landi Dep. 98:3–11, 99:11–12).

Defendant did testify that he believed at some point that Plaintiff had 136 S9s at the East

Moline warehouse, though he also testified that he did not think he ever physically verified that

amount.  Landi Dep. 90:15–94:11.  But no part of the evidence cited by Plaintiff supports that he

noticed that twenty-six S9s were not operational or were missing let alone that Defendant exerted

unauthorized control or dominion over twenty-six S9s.  In support of his statement that he

noticed that twenty-six of his S9s were not operating, Plaintiff cites to the part of Defendant's

deposition where Defendant was responding to the following question from Plaintiff's attorney: "So as of March 2022, if [Plaintiff] claims 26 of his S9s were missing from the warehouse, would you have any way to verify or deny that?" *Id.* at 98:3–5. Defendant responded that he did not "know how [he] would verify that" other than going in and counting the machines, *id.* at 98:6–11. This is not evidence that twenty-six S9s were missing—that was merely a hypothetical question from Plaintiff's attorney. The other part of Defendant's deposition Plaintiff cites is Defendant's testimony that if an S9 had been decommissioned, Plaintiff would notice because he was constantly monitoring his rigs. *Id.* at 99:5–12. A jury could not find based on this statement that Plaintiff in fact noticed any S9 was decommissioned or nonoperational.

Plaintiff has failed to point to any admissible evidence that any of his S9s were ever missing, turned off, or otherwise converted. Accordingly, his summary judgment motion is denied as it relates to conversion of S9s, and Defendant's motion is granted.

### c. Bytecoin Bonus

The next type of property at issue in the conversion claim is "$13,000 of Bytecoin" that was allegedly earned by Maruyama via "a 500,000 Bytecoin bonus." Compl. 4. Neither Plaintiff nor Defendant point the Court to any authority addressing whether cryptocurrency is considered property that can be converted in Illinois, so the Court assumes it is for purposes of resolving the instant motions.

Plaintiff states that he was entitled to a 500,000-coin bonus when his equipment surpassed mining a certain amount of a cryptocurrency called Bytecoin. Maruyama Decl. ¶ 6, Pl.'s Mot. Summ. J. Ex. D, ECF No. 51-4. And he states that the "bonus to which [he] was entitled was directed by [Defendant] to a wallet address owned and/or controlled by [Defendant]." *Id.* ¶ 7. Defendant disputes that Plaintiff was entitled to the bonus, citing to his

deposition testimony that the bonus "turned out being a complete scam that [he] completely advised against." Landi Dep. 150:3–7. He explained that this was an endeavor Plaintiff "engaged in with Austin Tharp" and that Tharp and Plaintiff "went for it" but "never hit the required amount in order to receive that payout." *Id.* at 150:8–21. This competing evidence shows a dispute of fact as to whether Plaintiff's equipment mined enough Bytecoin to be entitled to the alleged 500,000-Bytecoin bonus.

But this is not sufficient to create a genuine dispute of material fact as to the elements of conversion. "The essence of conversion is the wrongful deprivation of one who has a right to the immediate possession of the object unlawfully held." *Wei Quan v. Arcotech Uniexpat, Inc.*, 122 N.E.3d 767, 771 (Ill. App. Ct. 2018) (quotation marks omitted). The plaintiff must show that he has a "right to immediate possession of the property, absolutely and unconditionally." *Id.* If the property at issue is money, the money "must be capable of being described as a specific chattel." *Id.* (quotation marks omitted). An action for conversion "will not lie for money represented by a general debt or obligation. It must be shown that the money claimed, or its equivalent, at all times belonged to the plaintiff and that the defendant converted it to his own use." *Id.* (quotation marks omitted). The Court finds it appropriate to apply these principles to this case as Plaintiff is claiming conversion of a type of currency (and even alleges that the dollar equivalent of the Bytecoin was converted).

Plaintiff has failed to point to any evidence showing that he had an ownership interest in or a right to immediate possession of any 500,000-coin bonus that he earned. Plaintiff claims that because the mining rigs belonged to him, "any cryptocurrency which was mined from such equipment also logically belongs to [him]." Pl.'s Resp. 21. He claims that he "has also shown he has the absolute and unconditional right to the immediate possession of his property as the

14

owner of such property." *Id.* These conclusory statements, unsupported by any evidence[5] or law, do not suffice to meet Plaintiff's burden at this "put up or shut up" stage of the lawsuit. *See Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024) (quotation marks omitted).

Moreover, the evidence shows that Plaintiff was not given immediate control and ownership of cryptocurrency mined from his equipment. Defendant testified at his deposition that any cryptocurrency or coins made from mining would be put into "wallets," that Defendant would invoice Plaintiff for the cost of running the mining equipment and any other fees, and then Defendant would "send [Plaintiff] the coins." Landi Dep. 176:10–177:24. Defendant also testified that Plaintiff at least once paid him for expenses by "letting [him] keep the cryptocurrency that was mined from his rigs." *See id.* at 194:12–22 (testifying that this is how Plaintiff paid Defendant for setting up rigs in 2021). In his answers to interrogatories, Defendant stated that "[a]fter . . . fees were deducted from the number of coins mined then the balance was transferred to" Plaintiff. Landi's Answers to First Set Interrogs. 7, Pl.'s Mot. Summ. J. Ex. B, ECF No. 51-2. Both Defendant and Redeker also testified that, at times, any cryptocurrency mined from Defendant or Defendant's customers' (including Plaintiff's) equipment was placed in an "account that [Redeker] exclusively had access to" and that Redeker would use that currency to pay the power bill before sending the rest to Defendant to send on to his customers. *See* Landi Dep. 79:10–16; Redeker Dep. 50:21–51:7, Pl.'s Mot. Summ. J. Ex. C, ECF No. 51-3.

---

[5] For the statement that any cryptocurrency mined from his equipment logically belongs to him, Plaintiff cites his responses to Defendant's facts ten, fifteen, nineteen, twenty-eight, and thirty-two. *See* Pl.'s Resp. 21. None of these responses cites to evidence which actually supports that Plaintiff owned the cryptocurrency. *See id.* at 6–10. Most simply deny Defendant's facts on the basis that they are legal conclusions and are unsupported by the record, cite to Plaintiff's self-created documents, or argue that references to an intent to repay are evidence that cryptocurrency was owned by Plaintiff without any legal supoprt. For the statement that Plaintiff has the absolute and unconditional right to his property as the property's owner, Plaintiff cites his responses to Defendant's facts three, seven, eleven, sixteen, twenty, twenty-nine, and thirty-three. *See id.* at 21. Again, none of these responses cites to evidence that supports that Plaintiff has a right to immediate possession of any particular cryptocurrency. *See id.* at 4–11. Some simply reiterate Plaintiff's belief that he had a right to immediate possession of property as the property's alleged owner, while some contend that Defendant's facts are legal conclusions unsupported by the record. *See id.*

Even viewing the evidence in the light most favorable to Plaintiff, it is clear that Plaintiff did not have a right to immediate, unconditional possession of any cryptocurrency mined with his equipment. Instead, the cryptocurrency would go to either Defendant or Redeker, they would either require separate payment or deduct cryptocurrency for the cost of running Plaintiff's equipment, and then Plaintiff would get the leftovers. The Court need not understand the exact intricacies of the relationship between the parties—all that matters at this juncture is that Plaintiff has entirely failed to demonstrate how he could show that he was entitled to immediate possession of the Bytecoin bonus or how he could show that the Bytecoin bonus belonged to him at all times. *Cf. TABFG, LLC v. Pfeil*, No.08 C 6979, 2009 WL 3617514, at \*4 (N.D. Ill. Oct. 28, 2009) (finding that the plaintiff could not state a conversion claim where his right to the money he sought arose "from the terms of the parties' agreement" which provided that the plaintiff was entitled to fifty percent of profits less expenses).

For good measure, the Court notes that Plaintiff has also failed to establish an issue of fact as to the demand element. "[D]emand for possession of the property" is an element of a conversion claim. *Yanni*, 48 N.E.3d at 1166. Plaintiff argues that "[d]emand is not necessary to prove a claim for conversion when the object complained of has been depleted or used up by the defendant." Pl.'s Resp. 22 (citing *Mayle v. Urban Realty Works, LLC*, 202 N.E.3d 1011, 1032 (Ill. App. Ct. 2022)). He further argues that "[t]he record is rife with evidence [Defendant] has depleted, used or otherwise disposed of the mining rigs or cryptocurrency at issue." *Id.* at 16, 22 (citing Landi Dep. 173:3–8; Maruyama.000082–85, 88–89, Def.'s Mot. Summ. J. Ex. C, ECF No. 50-4 at 36–39, 42–43). But the only parts of the record Plaintiff cites do not, in fact, support that finding. Plaintiff first cites Defendant testifying that he lost 75 percent of 150 ETC that Plaintiff either loaned or gave to Defendant. Landi Dep. 168:19–173:8. This is about a wholly

16

different kind of cryptocurrency, so it does not tend to show that Defendant disposed of a 500,000-Bytecoin bonus. Plaintiff next cites messages from January and April 2020 showing Defendant asking Plaintiff for money and asking Plaintiff to buy his equipment to pay off loans he owed to a bank. *See* Maruyama.000082–85, 88–89. For these to support that Plaintiff depleted the 500,000-Bytecoin bonus, Plaintiff must be arguing that the fact that Defendant asked for money or financial help means that he had no money he could put toward his loans which must mean that he spent or sold any cryptocurrency he had taken from Plaintiff. These are speculative inferences that the Court is not required to draw. *See Grant*, 870 F.3d at 568 (stating that a non-movant is not entitled to the benefit of inferences supported by speculation or conjecture).

With no evidence that Defendant depleted the 500,000-Bytecoin bonus, Plaintiff would need to create a genuine issue of fact as to whether he made a demand for return of his bonus. He points to no evidence showing he made such demand. Accordingly, Defendant is entitled to summary judgment on Plaintiff's claim that Defendant converted 500,000 Bytecoin and Plaintiff's motion for summary judgment is denied as to this claim.

### d. LTC & ETH

Next, Plaintiff claims that Defendant converted 1,285.121957 LTC (which was allegedly deposited as $209,118) and 97.22638594 ETH from him between 2020 and 2022. Compl. 4. Again, neither party points the Court to authority addressing whether cryptocurrency is property subject to conversion in Illinois, so the Court assumes that it is for purposes of resolving the instant motions.

Plaintiff argues that "[b]etween November 30, 2020, and March 3, 2022, several of [his] rigs were directed to accounts not owned or controlled by [him] and mined 1,285.121957 LTC"

17

and that during the same time period, his "ETH rigs mined 97.22638594 ETH, none of which

[Plaintiff] ever received." Pl.'s Mot. Summ. J. 5. But he has no evidence to support these

statements. Plaintiff points to transaction logs, Maruyama.000058–75, Pl.'s Mot. Summ. J. Ex.

E, ECF No. 51-5 at 16–33, and a chart, Maruyama.000076–78, Pl.'s Mot. Summ. J. Ex. E, ECF

No. 51-5 at 41–43. The logs and charts are, yet again, completely unexplained—Plaintiff does

not identify where they came from, who authored them and when, or what they purport to show.

Defendant states that they are "transaction records which do not indicate whether the transactions

are transfers between wallets or mining activity, and do not indicate the source or destination of

each transaction." Def's Resp. 4. Even more troubling to the Court, as out-of-court statements

offered to prove their truth, the transaction records are hearsay, and Plaintiff makes no attempt to

show how they could be admissible at trial.

    The only other evidence Plaintiff cites to is messages from Defendant to Plaintiff in

March 2022 that Plaintiff argues are admissions of wrongdoing by Defendant. *See* Pl.'s Mot.

Summ. J. 5. First, Plaintiff argues that Defendant admitted that Plaintiff's "ETH had been

directed to his electronic wallet." *Id.* (citing Landi Dep. 214:1–6, 216:21–18 [sic]; Landi Dep.

Ex. 47, ECF No. 51-1 at 258–74). Plaintiff is likely referring to a March 1, 2022 message to

Plaintiff in which Defendant acknowledges that something is his address but also states that he

"did not put [it] there." Mar. 1, 2022 11:18:46am Landi Message, Landi Dep. Ex. 47, ECF No.

51-1 at 269. The context of the contemporaneous messages shows that Defendant was talking

about his email address, not a wallet address. See Mar. 1, 2022 11:16:50am Maruyama Message,

Landi Dep. Ex. 47, ECF No. 51-1 at 266 ("Who's email address is that?"). Moreover, Defendant

testified that someone else changed the email address on a wallet account to his email address.

Landi Dep. 217:14–21. Even viewing the evidence in the light most favorable to Plaintiff, it is

unreasonable to construe that message as an acknowledgment that Defendant converted any ETH from Plaintiff.

Next, Plaintiff argues that Defendant admitted through a Facebook message that the LTC was "1k" and would be paid back to Plaintiff. Pl.'s Mot. Summ. J. 5 (citing Landi Dep. 218:11–16; Landi Dep. Ex. 36, ECF No. 51-1 at 245–50). Plaintiff is referring to a 2022 message from Defendant to Plaintiff where Defendant said: "[C]ome on man the litecoin is 1k and will all be paid back to you." Mar. 3, 2022 9:23:35pm Landi Message, Landi Dep. Ex. 36, ECF No. 51-1 at 245. Plaintiff argues that this means that Defendant "admitted he had one thousand . . . LTC in his possession which were to be returned to" Plaintiff. Pl.'s Resp. 23. Neither party explains the context in which that one statement was made—Defendant states that he made a mistake and that "[t]he motives behind what [he] did were good," Mar. 3, 2022 9:23:35pm Landi Message, but the Court has no context for what that means—but even if it tended to show that Defendant planned to give Plaintiff 1,000 LTC, it says nothing about whether Defendant got the 1,000 LTC from Plaintiff by directing it to his own accounts from Plaintiff's mining equipment. The message might be an admission of wrongdoing, but the Court would have to speculate to infer that it shows that Defendant exerted unauthorized and wrongful assumption of control, dominion, or ownership over LTC and ETC that Plaintiff had ownership of and an absolute right to immediate possession of.

Plaintiff has not shown that a jury could find in his favor on this part of the conversion claim. Accordingly, Defendant's summary judgment motion is granted as to this part of the conversion claim, and Plaintiff's motion is denied.

####   e.   ETC

The next piece of property Plaintiff alleges Defendant converted from him is 152 ETC. Compl. 5.  The Court again presumes that this is property that can be converted in Illinois for purposes of resolving these motions.

The parties agree that Plaintiff gave Defendant 300 ETC in May 2021 and that sometime thereafter Defendant paid Plaintiff back 148 ETC.  Plaintiff contends that this was a loan, so Defendant converted the remaining 152 ETC.  *See* Pl.'s Mot. Summ. J. 6, 10.  Defendant has provided an affidavit in which he states that rather than Plaintiff loaning him 300 ETC in May 2021, he "invested 300 ETC belonging to [Plaintiff] in a speculative futures position at [Plaintiff's] request."  Landi Aff. ¶¶ 13–14, Def.'s Mot. Summ. J. Ex. E, ECF No. 50-5. Defendant states that "[s]hortly after the speculative ETC futures position was taken, [Plaintiff] changed his mind and requested that [Defendant] return half of the ETC to him."  *Id.* ¶ 15. Defendant states that he returned 148 ETC to Plaintiff.  *Id.*  Defendant states that he "provided credit to [Plaintiff] on future[] invoices to compensate [Plaintiff] for the ETC lost due to market fluctuation, despite not being obligated to do so."  *Id.* ¶ 17.

Plaintiff fails to explain how this kind of loan could form the basis of a conversion claim if he is merely claiming that Defendant failed to pay back the loan.  *Cf. Wei Quan*, 122 N.E.3d at 773 (finding that the plaintiff stated a conversion claim against an individual defendant based on the defendant's failure to pay back $6,250 that the plaintiff demanded be paid back and that was "specifically refundable under the [plaintiff's] service agreement" with the defendant's employer, and noting as relevant that the plaintiff had no debtor-creditor relationship with the individual defendant so the money demanded was not a general debt).  In any case, Plaintiff fails

to point to any evidence that contradicts Defendant's statements in the affidavit that the 300 ETC was not a loan but instead Defendant investing Plaintiff's ETC as requested by Plaintiff. In support of his contention that the 300 ETC was given as a loan, Plaintiff cites to the complaint and to Defendant's deposition. *See* Pl.'s Mot. Summ. J. 5 (citing Compl. ¶ 28; Landi Dep. 168:22–169:5). The portion of Defendant's deposition that Plaintiff cites is Defendant agreeing that the complaint alleges that Plaintiff loaned him 300 ETC on or about May 29, 2021. *See* Landi Dep. 168:19–169:5. This is not evidence that Plaintiff in fact loaned Defendant 300 ETC. (The portion cited also includes Defendant's testimony that "it was not a loan," *id.* at 168:24, but Plaintiff fails to address that.) The complaint's allegations are not evidence. In response to Defendant's contention that this was not a loan, *see* Br. Supp. Def.'s Mot. Summ. J. 5, Plaintiff also cites a part of Defendant's deposition where Defendant indicated that he did, in fact, pay Plaintiff back by providing credits against Plaintiff's bills for a few months out of good faith. *See* Pl.'s Resp. 8 (citing Landi Dep. 173:16–24). But a post-hoc voluntary decision to pay does not create a genuine issue of fact as to whether this was a loan. Without any evidence that this was a loan, Plaintiff cannot establish a right to the ETC and therefore cannot establish a triable issue on this portion of the conversion claim. Accordingly, Defendant's motion is granted as it relates to the 152 ETC, and Plaintiff's motion is denied.

### f. Retained Cryptocurrency

The last allegedly converted property at issue is miscellaneous coins that Plaintiff alleges Defendant retained when their business relationship terminated. *See* Compl. 5. The parties agree that Defendant has retained 0.247442 ETH,[6] 2.4006 ETC, and 6 LTC that was earned by Plaintiff's mining equipment. *See* Pl.'s Mot. Summ. J. 6; Def.'s Resp. 5 (not contesting that

---

[6] Plaintiff is not consistent about the whether the amount is 0.247442 or .0247442. *Compare* Pl.'s Mot. Summ. J. 6, *with id.* at 17.

Defendant is retaining those coins). But Defendant testified that he retained the coins because Plaintiff did not pay him for the costs he incurred running Plaintiff's mining equipment. Landi Dep. 176:2–177:10; *see also* Landi Aff. ¶ 19 ("I retained the 0.247442 ETH, 2.4006 ETC, and 6 LTC . . . as said cryptocurrency coins had not been paid for by [Plaintiff]."). Plaintiff relies on the same undeveloped arguments that he must be the owner of cryptocurrency mined by equipment that he owns and that he must have a right to immediate possession of cryptocurrency as its owner. *See* Pl.'s Mot. Summ. J. 9–10. As the Court explained above, the evidence shows that Defendant did not pay Plaintiff whatever coins he was entitled to until after Plaintiff paid Defendant his costs. Plaintiff has not provided any evidence to contradict that this is how the relationship worked. Since the only evidence in the record is that Plaintiff's right to the coins was conditional, Plaintiff cannot establish every element of this part of the conversion claim. Accordingly, Plaintiff's motion is denied as to the cryptocurrency retained after the end of the parties' relationship and Defendant's motion is granted.

## C. Fraud

Plaintiff's next claim is that Defendant made false statements that induced him to overpay for electricity costs and to pay for equipment that he already owned. Compl. 4. "To establish fraud, a plaintiff must prove (1) a false statement or omission of a material fact; (2) knowledge or belief of the falsity by the party making it; (3) intention to induce the other party to act; (4) action by the other party resulting in reliance on the truth of the statements; and (5) damage to the other party resulting from such reliance." *Lindy Lu LLC v. Ill. Cent. R.R. Co.*, 984 N.E.2d 1171, 1176–77 (Ill. App. Ct. 2013) (citing *Bd. of Educ. of City of Chi. v. A, C & S, Inc.*, 546 N.E.2d 580, 591 (Ill. 1989)).

### a. Electricity Bills

The parties agree that, as part of their relationship, Defendant charged Plaintiff for "overhead costs, such as rent and electricity, in addition to his programming and maintenance services." Pl.'s Mot. Summ. J. 6; Def.'s Resp. 6. Plaintiff received invoices from Coingen, the company owned by Defendant's company QCEM and Redeker's company Twin Titans which owned the warehouse where Plaintiff's mining equipment was stored and run. He was also provided access to a spreadsheet detailing overhead costs. But he was not provided the underlying electricity bills or any explanation of how the electricity costs were calculated. Redeker was responsible for "allocating the MidAmerican Energy bill between" he and Defendant. Landi Dep. 39:19–24. Defendant did not see the bills himself until some unidentified point in time. *Id.* at 40:1–10. Plaintiff's claim is that Defendant intentionally misrepresented the electricity costs that Plaintiff's equipment incurred, inducing Plaintiff to pay more for electricity than he otherwise would have. *See* Pl.'s Mot. Summ. J. 11–12.

For at least two reasons, Plaintiff fails to establish that there is sufficient evidence for a jury to find in his favor on this claim. First, there is no evidence that Plaintiff and Defendant ever agreed that Plaintiff would only pay the precise cost of the energy his machines used.[7] Without such an agreement, Plaintiff's claim must fail because the amount Defendant charged Plaintiff would not amount to a statement of how much energy Plaintiff's machines used.

Second, Plaintiff has provided no evidence from which a factfinder could determine that Defendant overcharged him for electricity even once. Plaintiff primarily relies on comparing his

---

[7] Defendant testified that there were additional charges for exhaust fans that ran in the warehouse all day, Landi Dep. 42:5–15, and that Coingen charged Defendant's company for more than "just the power . . . to make sure that there was extra" money to cover repairs, *id.* at 43:3–10. These statements suggest that Defendant likely charged Plaintiff for more than simply the electricity Plaintiff's equipment used.

January 2022 invoice from Coingen for $25,878.65, *see* Jan. 2022 Invoice, Pl.'s Mot. Summ. J.

Ex. F, ECF No. 51-6 at 7, and the spreadsheet he had access to which shows that in January

2022, QCEM paid $11,492.02 to Coingen for power and rent, *see* Spreadsheet 3, Redeker Dep.

Ex. 27, ECF No. 51-3 at 57–61; Redeker Dep. 107:18–108:23, 111:4–112:2. Plaintiff claims that

the spreadsheet means that QCEM had a total of $11,492.02 in expenses, but he cites to no

testimony or evidence showing that power and rent to Coingen were the only two expenses

QCEM had. Plaintiff also argues that, assuming that Defendant charged him for the entirety of

those expenses, the remaining $14,386.63 he was charged in January 2022 could only represent

Defendant's share of the profits. Pl.'s Mot. Summ. J. 12. He argues that it is implausible that

Defendant was entitled to $14,386.63 of profits because that would mean that Plaintiff's mining

equipment netted a profit of $143,866.30 that month—recall that in 2021, the parties agreed that

Defendant would get ten percent of the profits—whereas Defendant testified that in a good

month, the revenue for Plaintiff's equipment was only approximately $80,000. *Id.* at 4, 12

(citing Landi Dep. 195:8–9). Accordingly, Plaintiff argues, Defendant must have been

overcharging him for electricity. This speculative series of assumptions and inferences is not

competent evidence to find that Plaintiff was overcharged even in that one month. The only

other evidence that Plaintiff has to support that he was overcharged for electricity is three

spreadsheets containing calculations that he did himself. *See* Maruyama.000081, Pl.'s Mot.

Summ. J. Ex. E, ECF No. 51-5 at 44. Like with Plaintiff's other self-created documents,

Plaintiff makes no argument as to how these would be admissible at trial and points to no

evidence explaining how Plaintiff made his calculations, what information he based them on, or

how they would be within his personal knowledge. He simply argues that Defendant "has

provided no evidence to dispute the amount of overcharges." Pl.'s Mot. Summ. J. 13. But as the party with the burden to proof, Plaintiff has to come forward with evidence to support his claims.

Accordingly, Plaintiff's motion is denied as to his fraud claim based on electricity bills, and Defendant's motion is granted.

### b. Equipment

Plaintiff next alleges that Defendant defrauded him by having him purchase mining equipment that Plaintiff already owned and charging him a $5,000 set up fee for work that was never performed. Compl. 6. Plaintiff argues that Defendant "concocted a fraudulent deal whereby [Plaintiff] purchased six . . . gigahash worth of ETH rigs and paid for the rigs using the cryptocurrency they mined." Pl.'s Mot. Summ. J. 13. He states that he learned in March 2022 that Defendant had not purchased any new rigs but instead was using rigs Plaintiff already owned. *Id.*

The only evidence Plaintiff cites to support his claim is Defendant's deposition. *See id.* at 7 (citing Landi Dep. 193:6–194:11, 195:23–196:1). But the cited parts of the deposition do not support Plaintiff's claim. Defendant testified that in April 2021, he "held onto" $86,000 worth of cryptocurrency that Plaintiff's equipment mined in exchange for six "gigahash worth of miners" or six "gigahash worth of rigs" "that came online." Landi Dep. 195:23–196:21. Defendant also testified that on approximately April 30, 2021, he charged Plaintiff $5,000 to set up those rigs which he built. *Id.* at 193:6–16. He testified that he did not have documentation of the component parts that were purchased to set up those rigs. *Id.* at 193:17–24. And he testified that he did not invoice Plaintiff for the cost of setting up the rigs because he just took the $5,000 out of the "coins mined for that month." *Id.* at 194:6–17.

25

None of this shows that Defendant made a false statement. Plaintiff's only support for the idea that Defendant did not actually purchase or set up equipment is the allegation in the complaint that in 2022 he "learned" that rather than purchasing and assembling new equipment, Defendant used equipment Plaintiff already owned. *See* Pl.'s Mot. Summ. J. 7 (citing Compl. ¶ 43). Allegations in a complaint are not evidence.

Plaintiff has the burden of proof on his claims, so he must identify evidence that shows that a jury could find in his favor. Having failed to do so, the Court denies Plaintiff's motion as to the equipment fraud claim and grants Defendant's motion.

### D. Breach of Fiduciary Duty

Plaintiff argues that he "placed enormous amounts of trust in" Defendant to manage his business affairs at the warehouse in Illinois, that this trust gave rise to a fiduciary duty, and that Defendant breached this duty by retaining Plaintiff's cryptocurrency, disposing of his mining equipment, and overcharging him for electricity. Pl.'s Mot. Summ. J. 14–15. In other words, Plaintiff's breach of fiduciary duty claim relies on "the same misconduct alleged in" the conversion and fraud claims. Pl.'s Resp. 26.[8] Defendant argues that Plaintiff's breach of fiduciary duty claim "is wholly derivative of his underlying claims" for conversion and fraud. Def.'s Resp. 13; Br. Supp. Mot. Summ. J. 23.

To prevail on a claim for breach of fiduciary duty under Illinois law, a plaintiff must prove: "(1) that a fiduciary duty exists, (2) that the fiduciary duty was breached, and (3) that such breach proximately caused the injury of which the party complains." *Indeck Energy Servs. v.*

---

[8] In the response to Defendant's summary judgment motion, Plaintiff suggests that he is also claiming that Defendant breached his fiduciary duty by failing to account to Plaintiff for his dealings. Pl.'s Resp. 26. This factual theory is not mentioned in the complaint. And Plaintiff only ever addresses it in the summary judgment response with conclusory statements like that Defendant "failed to provide accountings to [Plaintiff] for the vast majority of [Defendant's] dealings" and that this failure to account "has proximately caused the injuries [Plaintiff] alleges." *Id.* The scope of any duty Defendant would have to provide information or to account for his dealings on Plaintiff's behalf is undeveloped legally and any breach of such a duty and resulting injury is undeveloped factually.

*DePodesta*, 183 N.E.3d 746, 759–60 (Ill. 2021). Even if the Court assumes for purposes of the summary judgment motions that Defendant had a fiduciary duty to Plaintiff, because the parties agree that any breach is based on the same misconduct underlying the conversion and fraud claims, the Court must deny Plaintiff's motion as to the breach of fiduciary duty claim and grant Defendant's motion. Plaintiff has failed to provide enough evidence from which a jury could find that Defendant committed the misconduct Plaintiff alleges.

### E. Breach of Contract

Plaintiff's last claim, for breach of contract, relates to money that Plaintiff contends he loaned to Defendant for "purposes outside the scope of their business relationship." Pl.'s Mot. Summ. J. 7. The parties do not dispute that Plaintiff gave Defendant $17,000 in January 2021 for the purpose of repaying part of QCEM's loans, and that Plaintiff gave Defendant an additional $8,180 in April 2020 and $4,927 after that, for a total of $30,107. *See* Pl.'s Mot. Summ. J. 8; Def.'s Resp. 7–8. Plaintiff argues that Defendant failed to pay these loans back, constituting breaches of each contract to repay Plaintiff. *See, e.g.*, Pl.'s Mot. Summ. J. 15–16. Defendant argues that Plaintiff cannot show that there was a valid and enforceable contract that he could have breached, that even if a contract existed it contained no terms indicating when he would need to repay Plaintiff, and that he repaid Plaintiff through credits on his monthly bills. *See, e.g.*, Br. Supp. Def.'s Mot. Summ. J. 23–25; Def.'s Resp. 14–15.

For a valid and enforceable contract to exist under Illinois law, there must be an offer, acceptance of the offer, consideration, and mutual assent. *Wilda v. JLG Industries, Inc.*, 470 F. Supp. 3d 770, 798 (N.D. Ill. 2020) (citing *Nat'l Prod. Workers Union Ins. Tr. v. Cigna Corp.*, 665 F.3d 897, 901 (7th Cir. 2011)). The existence of acceptance and mutual assent—whether the parties have a "meeting of the minds"—is based on the parties' objective conduct; "subjective

intentions are irrelevant." *Nat'l Prod. Workers*, 665 F.3d 897 at 901.  The question of whether a contract exists "is usually one for the factfinder." *Id.* at 902.

Plaintiff argues that Facebook messages in the record show that he offered to send Defendant money and Defendant accepted.  Pl.'s Mot. Summ. J. 16.  The parties dispute whether the messages show that they came to a meeting of the minds on the essential terms of a loan, but neither cites any cases that discuss what those essential terms might be.[9]  Caselaw the Court has located states that "[t]he essential elements or terms of a promise to pay are: (1) the parties to the agreement, (2) the nature of the transaction, (3) the amount in question, and (4) at least a reasonable implication of an intention to repay the debt." *Kranzler v. Saltzman*, 942 N.E.2d 722, 726 (Ill. App. Ct. 2011).

Here, there is likely evidence from which a jury could find these terms exist for the $17,000 loan in January 2021.  Defendant does not dispute that Plaintiff sent him $17,000, and the messages in which Defendant asked for the money include statements from Defendant that he would repay Plaintiff in the form of excusing Plaintiff's electricity payments until he was repaid in full.  *See* Maruyama.000083–84, Pl.'s Mot. Summ. J. Ex. E, ECF No. 51-5 at 45–46 ("I would turn on and point miners to you without you paying any of the powerbill at all.  Essentially my repay payments would be to the power company. . . . We can do this until I have you paid back in full.").  But Plaintiff does not point to any evidence in the record indicating that Defendant breached this agreement.  Other than the messages (which do not show that Defendant failed to Plaintiff back), Plaintiff points only to the complaint, which is not evidence.  *See* Pl.'s Mot.

---

[9] Plaintiff also argues that because the because the parties had a history of "engaging in loan agreements" without "establishing terms such as interest rates, loan terms, precise repayment terms, etc. . . . it is not essential those things be shown to prove a valid contract," Pl.'s Resp. 27 (citing *Academy Chi. Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991)).  *Academy Chicago Publishers* does not support Plaintiff's position.  Rather, it stands for the proposition that while "[a] contract may be enforced even though some contract terms may be missing or left to be agreed upon, . . . if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Academy Chi. Publishers*, 578 N.E.2d at 984.

Summ. J. 8 (citing Compl. ¶ 48); Pl.'s Resp. 27 (stating that Defendant told Plaintiff he "would repay the amounts in full, but failed to do so" without citing any evidence to support that Defendant failed to repay the amounts due).

For the $8,180 payment, the messages Plaintiff cites say only that Defendant's "goal [wa]s to be able to pay [Plaintiff] and bank off."  Maruyama.000088, Pl.'s Mot. Summ. J. Ex. E, ECF No. 51-5 at 47.[10]  This does not imply an enforceable intent to repay the debt.  Moreover, Plaintiff fails to point to any evidence showing that Defendant failed to pay him back.  *See* Pl.'s Mot. Summ. J. 8 (citing Compl. ¶ 48).  For the $4,927 payment, Plaintiff cites to Defendant's deposition testimony stating that Plaintiff gave him $4,927 to put toward poker tournaments and that Plaintiff and Defendant would split any profits Defendant made 50/50.  *See* Landi Dep. 205:10–207:17.  This does not evince an enforceable intent to repay either.  And, once again, he has no evidence that Defendant did not pay him back.  He cites to Defendant's testimony that money from playing in poker tournaments was paid to Plaintiff, though Defendant could not recall how much, *see id.* at 208:23–209:9, and the complaint.

As Plaintiff has failed to put forth evidence from which a jury could find that Defendant breached any contracts that may have existed, he cannot succeed on his breach of contract claim.  Accordingly, Defendant's summary judgment motion is granted as to this claim and Plaintiff's motion is denied.

## CONCLUSION

For the foregoing reasons, Plaintiff Alexander Maruyama's Motion for Summary Judgment, ECF No. 51, is DENIED.  Defendant Justin Landi's Motion for Summary Judgment, ECF No. 50, is GRANTED.  The Clerk is directed to enter judgment and close the case.

---

[10] Interestingly, Defendant testified at his deposition that Plaintiff gave him $8,180 in April 2020 to put toward poker tournament buy-ins.  *See* Landi Dep. 202:19–204:4.

29

Entered this 30th day of September, 2025.

s/ Sara Darrow
_____
SARA DARROW
CHIEF UNITED STATES DISTRICT JUDGE
